James MILLIO, Petitioner,

v.

Wayne BARKLEY, Superintendent, Riverview Correctional Facility, Respondent.

No. 97–CV–557H.

United States District Court, W.D. New York.

April 22, 1999.

---

## DECISION & ORDER

HECKMAN, United States Magistrate Judge.

In accordance with the provisions of 28 U.S.C. § 636(c), the parties to this case have consented to have the undersigned conduct all proceedings, including entry of final judgment (Item 8). Petitioner has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

## BACKGROUND

In an effort to save money for their retirement, Arthur and Charlotte Taylor supplement their income by selling diamonds and jewelry from their home (Tr. at 39). On August 13, 1992, at approximately 7:00 P.M., Arthur Taylor received a telephone call from a man who identified himself as "John" (Tr. at 40–41). The Taylors would eventually learn that John's real name was Norman Charnock. Charnock inquired about purchasing a diamond ring that Mr. Taylor advertised in the *Swap Sheet* (Tr. at 41, 182). An appointment

was made for Charnock to arrive at Mr. Taylor's house at 7:30 that evening (Tr. at 42). At 9:30 P.M., two people arrived at Mr. Taylor's home, identifying themselves as "John" and his "father" (*Id.* at 42–43). Charnock's father would later be identified as petitioner.

Mr. Taylor directed the two men to a counter that separates the kitchen from the living room (Tr. at 43, 188). Charnock stood next to Mr. Taylor, on his left (*Id.* at 45). Standing on Charnock's left was petitioner (*Id.* at 45). Mr. Taylor opened a briefcase and pulled out several pieces of jewelry to show Charnock and petitioner (*Id.* at 45, 189). During this period of time Mrs. Taylor was sitting in the living room and talking on the telephone to the manager of the family's primary business (*Id.* at 45, 98, 188). Mrs. Taylor joined the men in the kitchen when she finished her telephone conversation (*Id.* at 49).

A few moments later, Charnock asked to use the bathroom (*Id.* at 49–50, 102–03, 190). It was the second time he left the room to use the bathroom (*Id.* at 46, 190). When Charnock was returning from the bathroom the Taylors heard a bang, and thought that Charnock fell into the wall (*Id.* at 50, 103). Mr. Taylor asked, "John, are you okay" (*Id.* at 50). When Charnock appeared, he had a gun in his hands (*Id.* at 51, 104, 190). He then walked to the counter and announced a holdup (*Id.* at 52). Petitioner backed up behind Mr. Taylor (*Id.* at 52, 105). Charnock then ordered the Taylors to lie down on the floor and take off all of the jewelry that they were wearing (*Id.* at 52–53, 106–07, 191).

The Taylors removed their jewelry and laid down on their stomachs (*Id.* at 54, 107, 191). Using rope, Charnock tied Mr. Taylor's hands behind his back (*Id.* at 54, 191). Having run out of rope, Charnock cut an electrical cord off of a lamp and used it to tie Mrs. Taylor's hands behind her back (*Id.* at 54, 107, 191). Charnock then tied Mr. and Mrs. Taylor's ankles together (*Id.* at 54, 107).

Charnock took the jewelry that was on the floor and then went through the house looking for more valuables (*Id.* at 55, 108). He was heard screaming, "where's the rest of the jewelry, where's the money, where's the phone" (*Id.* at 55). He also asked about guns (*Id.* at 55). The Taylors could also hear petitioner going through the kitchen cupboards (*Id.* at 56, 108, 192). The only sound petitioner made was "a grunt, happy sounds" when he discovered approximately $800 that was located in the kitchen (*Id.* at 57, 108). Before leaving the Taylors' home, Charnock turned up the television's volume as loud as it would go (*Id.* at 58, 112). Charnock grabbed whatever telephones that he could find, and petitioner grabbed the briefcase containing the jewelry. The two men then left the house (*Id.* at 59, 115, 192).

A few minutes after Charnock and petitioner left the house, the Taylors untied themselves, and Mrs. Taylor called the police (*Id.* at 60, 114). The next day, Mr. Taylor called some friends in the jewelry business and informed them of the robbery (*Id.* at 62, 161).

Charnock and petitioner made several stops after leaving the Taylors house (*Id.* at 192). Along the way, they disposed of the briefcase, a telephone which was taken from the house, and hats and gloves that they wore during the robbery (*Id.* at 193). The next morning, they divided up the some of the stolen jewelry (*Id.* at 194). Charnock sold some pieces of jewelry at the Walden Flea Market (*Id.* at 195). He also removed some stones from their settings before trying to sell them (*Id.* at 195).

Charnock was arrested on August 31, 1992, while trying to sell three diamonds stolen from the Taylors (*Id.* at 139, 195). The owner of the Diamond Cutters, a Buffalo jewelry store, recognized the diamonds as belonging to the Taylors (*Id.* at 139, 163). The jeweler had sold the Taylors one of the diamonds, and evaluated the other two diamonds for Taylors a few weeks earlier (*Id.* at 163). Charnock plead

guilty to attempted robbery and received a sentence of six to twelve years (*Id.* at 179).

Petitioner was arrested on September 4, 1992 (*Id.* at 141). At the time of his arrest he was wearing a ring that was taken during the robbery (*Id.* at 142–43).

## PROCEDURAL HISTORY

In 1992, petitioner was indicted by an Erie County Grand Jury for robbery in the first degree, burglary in the first degree, and criminal possession of stolen property in the fifth degree. Indictment No. 92–2024–001.

A jury trial was held on August 18–23, 1994. On August 23, 1994, the jury found petitioner guilty of robbery in the first degree, in violation of N.Y.PENAL LAW § 160.15, burglary in the first degree, in violation of N.Y.PENAL LAW § 140.30, and criminal possession of stolen property in the fifth degree, in violation of N.Y.PENAL LAW § 165.35 (Tr. at 339–44). On October 11, 1994, petitioner was sentenced to concurrent indeterminate terms of incarceration of seven to twenty-one years for the burglary and robbery counts, and a conditional discharge for the stolen property conviction (Sent.Tr. at 6–7).

Petitioner filed a direct appeal to the Supreme Court, Appellate Division, Fourth Department (*See* Item 6, Ex. C). Four issues were raised on appeal: First, that the trial court abused its discretion by precluding the testimony of two alibi witnesses; second, that the proof adduced to convict petitioner of burglary in the first degree was insufficient as a matter of law; third, that petitioner was denied the opportunity to call a police officer and a complainant as witnesses at a *Wade* hearing; and finally, that incarceration was a harsh and excessive sentence that should be reduced in the interest of justice (*Id.*). The Appellate Division held that the trial court did not abuse its discretion by precluding the alibi testimony because petitioner never served a notice of alibi pursuant to N.Y.CRIM.PROC. § 250.20(1). *People v. Millio,* 226 A.D.2d 1071, 642 N.Y.S.2d

458 (1996). The panel also determined that petitioner's other issues lacked merit. *Id.* The New York Court of Appeals denied petitioner leave to appeal the Appellate Division's decision. *People v. Millio,* 88 N.Y.2d 990, 649 N.Y.S.2d 397, 672 N.E.2d 623 (1996).

On October 11, 1994, petitioner moved to vacate the judgment, pursuant to N.Y.CRIM.PROC. § 440.10. Petitioner made three claims (*See* Ex. E). Petitioner alleged that exculpatory information was not turned over by the prosecution, as required under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Petitioner also alleged that prosecutors engaged in misconduct by allowing a witness to testify falsely at trial. Finally, petitioner claimed ineffective assistance of counsel. Petitioner's motion was denied, and petitioner was denied leave to appeal this decision to the Appellate Division (Ex. E).

On June 2, 1997, petitioner filed this petition for a writ of habeas corpus in the United States District Court for the Northern District of New York (*See* Item 3). The case was transferred to this court because Erie County, the site of petitioner's trial and sentencing, is located in the Western District of New York. *Millio v. Barkley,* No. 97–CV–780 (N.D.N.Y. June 24, 1997) (transfer order).

Three claims are raised in petitioner's application for a writ of habeas corpus. Petitioner argues that the trial court improperly precluded his two alibi witnesses (*See* Item 3). Petitioner also argues that the proof adduced at trial was insufficient to convict him of burglary in the first degree (*Id.*). In addition, petitioner claims ineffective assistance of counsel because the first attorney handling his case never sought any alibi witnesses, and because he represented petitioner, even though he had represented petitioner's co-conspirator in an unrelated criminal matter (*Id.*). Respondent argues that the petition should be dismissed because petitioner failed to exhaust state court remedies (Item 7, at 3–

5). Each issue is considered, in turn, below.

## DISCUSSION

### I. Unexhausted Claims.

Before examining the merits of petitioner's claims, it is necessary to consider whether petitioner exhausted state court remedies. According to respondent, petitioner failed to raise the alleged conflict of interest claim in state court (Item 7, at 3). In addition, petitioner's claim that his attorney failed to obtain and utilize *Brady* material was raised in a N.Y.CRIM.PROC.L § 440.10 motion, but the court did not reach the merits of the claim because it could have been raised by petitioner on direct appeal. An application for a writ of habeas corpus by a person in the custody of a state will not issue unless the petitioner has exhausted all state court remedies. 28 U.S.C. § 2254(b)(1)(A).

■ Generally, a federal court will not entertain a habeas corpus petition from a state prisoner unless the prisoner has exhausted state court remedies. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Exhaustion of state remedies requires presentation of the claim to the highest state court from which a decision can be obtained. *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 190 n. 3 (2d Cir.1982). In addition, a petition that contains both exhausted and unexhausted claims should be dismissed so that the state courts have an opportunity to decide the unexhausted issues. *Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

■ However, federal courts may deny an application on the merits, notwithstanding a petitioner's failure to exhaust state court remedies. 28 U.S.C. § 2254(b)(2). This allow courts to deny habeas petitions that contain unexhausted claims that are deemed patently frivolous. *See Edkin v. Travis,* 969 F.Supp. 139, 140 n. 1 (W.D.N.Y.1997).

Accordingly, I will address the merits of petitioner's claims even though the state courts have not had an opportunity to address all of petitioner's claims.

### II. Preclusion of Alibi Witnesses.

■ Petitioner argues that the trial court, in violation of his constitutionally protected rights, impermissibly precluded his alibi witnesses. As the Supreme Court has noted, criminal defendants have a "right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *see United States v. Giovanelli,* 945 F.2d 479, 488 (2d Cir.1991); *see also, Taylor v. Illinois,* 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

■ Under New York law, after being served a notice of demand, a defendant has eight days in which to serve the prosecution with a list of names of any witnesses defendant intends to rely on for an alibi. N.Y.CRIM.PROC.L § 250.20(1). If the defendant does not file a notice of alibi, it is within the trial judge's discretion to accept the testimony of an alibi witness. *Id.* § 250.20(3). In addition, both the defendant and the prosecution have a continuous duty to disclose the names of any additional witnesses. *Id.* § 250.20(5).

The Supreme Court has upheld notice of alibi rules. *See Williams v. Florida,* 399 U.S. 78, 81–82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). In discussing the State of Florida's notice of alibi provisions, the Supreme Court stated that the provisions are an important tool to protect the State's interests:

> Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a

poker game in which players enjoy an absolute right always to conceal their cards until played. *Id.; see also Taylor*, 484 U.S. at 412 n. 17, 108 S.Ct. 646. The significance of the State's interest in learning of a defendant's alibi defense was reiterated by the Supreme Court in *Taylor*, when the Court noted that this was "one component of the broader public interest in a full and truthful disclosure of critical facts." *Taylor*, 484 U.S. at 412, 108 S.Ct. 646.

 It is acceptable to preclude testimony that violates a state's discovery rules. *Id.* at 410, 108 S.Ct. 646. "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contract or explain the opponents case." *Id.* at 410–11, 108 S.Ct. 646. Based on the facts in this case, petitioner's compulsory process rights were not impinged when the trial court rejected hearing his alibi witnesses.

Petitioner acknowledges that on October 2, 1992, the first attorney assigned to his case was served with an alibi demand notice (Tr. at 253, 256). An additional demand to be notified of an alibi defense was made on June 10, 1993, in the prosecutions omnibus response (*Id.* at 256; Ex. B). Petitioner never informed the prosecution of his desire to offer an alibi defense until the issue was raised at trial, after petitioner had testified (*Id.* at 256).

After the lunch recess on August 22, 1994, petitioner's trial counsel informed the court that he had two witnesses prepared to testify about petitioner's whereabouts until 8:30 or 9:00 P.M. the day of the robbery (*Id.* at 253). Petitioner intended to call his son, and a witness by the name of Alfred Melchiorre (*Id.* at 254). Petitioner's counsel also stated that he did not learn of the existence of Mr. Melchiorre until that morning (*Id.*). Both witnesses were prepared to testify that petitioner was working with his son on a job on Sheridan Road, near Transit Road, that lasted from 5:30 P.M. until 8:30 P.M. (*Id.* at 254–55).

At trial, petitioner testified that he was "innocent" of the charges (*Id.* at 244). However, petitioner never testified to the fact that he was working with his son on the night of the robbery because petitioner did not remember where he was that day (*Id.* at 255).

The trial judge determined that petitioner's late offer of an alibi defense "distort[ed] the intent of [N.Y.Crim.Proc.L. § ] 250.20" (*Id.* at 259–60). Besides recognizing that § 250.20 provides for notice of alibi early in the proceedings, the trial judge found no indication of an alibi in any of the pleadings filed by either of petitioner's two attorneys (*Id.* at 257). In addition, the trial judge noted that such late notification of an alibi "deprives the prosecution of the ability to investigate the claim" (*Id.* at 258).

States are entitled to protect themselves from this type of eleventh hour defense. *Taylor*, 484 U.S. at 412, 108 S.Ct. 646; *Williams*, 399 U.S. at 81–82, 90 S.Ct. 1893. I find that the trial court did not impinge petitioner's compulsory process rights by denying petitioner the opportunity to put forth testimony from two last minute alibi witnesses.

Accordingly, a petition for a writ of habeas corpus will not issue on this ground.

### III. Sufficiency of Proof at Trial.

 Petitioner also alleges that the proof adduced at trial was insufficient as a matter of law to convict him of burglary in the first degree. The New York Penal Law sets forth, in relevant part, the following elements for burglary in the first degree:

A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime there, and when, in effecting entry or while in the

dwelling or in the immediate flight therefrom, he or another participant in the crime: .... Displays what appears to be a pistol....

N.Y.PENAL L. § 140.30(4). Petitioner contends that he did not remain unlawfully in the complainants' house after complainants' permission to enter was withdrawn (Item 3).

When reviewing a claim that there was insufficient evidence to support a conviction, the court, viewing the evidence in the light most favorable to the prosecution, must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998); *Einaugler v. Supreme Court*, 109 F.3d 836, 839 (2d Cir.1997); *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994). In doing this, the court must determine "whether the record is so totally devoid of evidentiary support that a due process issue is raised." *Bossett*, 41 F.3d at 830 (quoting *Mapp v. Warden*, 531 F.2d 1167, 1173 n. 8 (2d Cir.1976).)

Petitioner was invited into the Taylors' home under the guise that he was there to purchase jewelry. During the course of the robbery, as he was rummaging through another part of the house in search of valuables, Charnock asked if a piece of jewelry he had just found was a zircon (Tr. at 57–58). Mr. Taylor replied, "yes [Charnock], it is. That's nothing but junk jewelry. You've got all the best stuff that I've got. Why don't you get the hell out of here and leave us alone" (*Id.* at 58, 111).

Viewing the evidence in a light most favorable to the prosecution, I find that a rational trier of fact could have found the essential elements of the crime of burglary in the first degree beyond a reasonable doubt. The record indicates that petitioner and Charnock entered the Taylors' home with the intent to commit a crime (*See id.* at 182). Charnock testified that

he and petitioner planned the crime a few days before it took place (*Id.*). Charnock also testified that he carried a .38 caliber revolver, and that he and petitioner wore hats in order to disguise their appearance (*Id.* at 187–88). The two co-conspirators even planned on tying up their victims (*Id.* at 188).

It is irrelevant that petitioner initially had Mr. Taylor's permission to enter the house in order to purchase jewelry. Under New York case law, when an individual enters a house by means of deception with the intent to commit a crime, the individual is entering or remaining unlawfully. *E.g., People v. Dupree*, 122 A.D.2d 852, 505 N.Y.S.2d 719, 720 (1986); *People v. Ludlowe*, 117 Misc.2d 567, 458 N.Y.S.2d 833, 835 (Sup.Ct.1983).

Accordingly, I find that there was sufficient evidence for a rational trier of fact to conclude that petitioner entered the Taylors' home without permission.

## IV. Ineffective Assistance of Counsel.

Petitioner also makes a claim of ineffective assistance of counsel because his trial counsel failed to obtain and utilize *Brady* material and failed to prepare an alibi defense. The alleged *Brady* material consisted of a taped conversation petitioner had with his co-conspirator, and a statement one of the complainants made at the line-up. In order to make an ineffective assistance of counsel claim, the petitioner must show that counsel's performance was deficient, and petitioner must also show that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Bloomer v. United States*, 162 F.3d 187, 192 (2d Cir.1998); *Tyson v. Keane*, 159 F.3d 732, 736 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999).

In determining whether counsel's performance was deficient, petitioner "must show that counsel's representation fell below an objective standard of reasonable-

ness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Bloomer*, 162 F.3d at 192. This "includes a consideration of all the circumstances surrounding the attorney's actions." *Bloomer*, 162 F.3d at 192. Finally, in evaluating counsel's conduct, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Bloomer*, 162 F.3d at 193.

## A. *Brady* Material.

■ Defendant alleges that his trial counsel was ineffective for failing to obtain and utilize *Brady* material (Item 3, at 6). Upon request by a defendant, the prosecution must turn over any evidence that "would tend to exculpate [the defendant] or reduce the penalty, or helps shape a trial that bears heavily on the defendant." *Brady*, 373 U.S. at 88, 83 S.Ct. 1194. Unless the defendant becomes aware of specific exculpatory evidence, it is the prosecution who determines what material will be turned over to the defendant. *Pennsylvania v. Ritchie*, 480 U.S. at 59, 107 S.Ct. 989; *United States v. Leung*, 40 F.3d 577, 582 (2d Cir.1994).

■ Petitioner's first attorney requested that the prosecution turn over any exculpatory evidence, and specifically requested a tape recorded conversation of Charnock and petitioner, made on August 31, 1992 (Ex. B). At the August 9, 1993, *Wade* hearing, petitioner's counsel noted that the prosecution had possession of a tape recorded conversation between Charnock and petitioner (Tr. of Aug. 31, 1993 ("Wade I"), at 81). In addition, petitioner's counsel indicated that the prosecution was going to arrange an opportunity for him to listen to the tape (*Id.*). At trial, Charnock testified about a taped telephone conversation he made to petitioner at the behest of the Erie County Sheriff's Department (Tr. at 197–99). The tape itself was never played at trial. According to detective Suchocki, the Sheriff's Department attempted to tape the conversation between Charnock and petitioner, but the recording did not work (*Id.* at 219).

Petitioner also alleges that he did not receive a statement made by one of the complainants at the line-up. At the line-up, Mr. Taylor questioned a police officer, asking whether the line-up contained a suspect (Wade I, at 28). Detective sergeant Rich refused to answer the question (*Id.* at 29–30). Petitioner's first attorney was aware of this statement, and questioned detective sergeant Daniel Rich about the statement at the *Wade* hearing (*Id.* at 27–31). Consequently, petitioner's counsel was not deficient in obtaining this information.

A review of the record shows that petitioner's attorneys were not deficient in trying to obtain *Brady* material. Petitioner's first attorney requested that any *Brady* material be turned over to petitioner. The record also shows that petitioner's first attorney made arrangements to listen to the tape, though the Sheriff's Department was unsuccessful in recording the conversation between Charnock and petitioner. In addition, the record shows that petitioner was aware of statements made by the complainants at the line-up. Based on this record, I find that petitioner's attorney did attempt to obtain the alleged *Brady* material.

Accordingly, petitioner's ineffective assistance of counsel claim fails on this ground.

## B. Failure to Raise Alibi Defense.

■ Petitioner also alleges that his counsel was ineffective for failing to raise an alibi defense. Petitioner's first attorney did not file a notice of alibi defense, as required under N.Y.Crim.Proc. § 250.20. As the Supreme Court in *Strickland* stated, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691, 104 S.Ct. 2052. Counsel's conduct was reasonable under *Strickland* because petitioner

never informed his attorney of any potential alibi witnesses. *See United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987); *Jones v. Hollins,* 884 F.Supp. 758, 766 (W.D.N.Y.1995); *see also United States v. Caputo,* 808 F.2d 963, 967 (2d Cir.1987) (recognizing the reasonableness of trial counsel not making a motion when the motion lacks a legal basis).

In addition, even if petitioner had informed counsel of potential alibi witnesses, failure to raise such a claim does not rise to the level of a constitutional violation because the decision to pursue a particular defense, or to call a particular witness, is a tactical decision to be made by counsel. *Nersesian,* 824 F.2d at 1321; *Jones,* 884 F.Supp. at 765; *Sanchez v. Scully,* 613 F.Supp. 1065, 1068 & n. 5 (S.D.N.Y.1985).

Petitioner does not recall where he was on the day that the Taylors were robbed (Tr. at 255). Just prior to the trial, petitioner's trial counsel spoke with petitioner's son in an effort to determine where petitioner and his son were on the day of the robbery (*Id.* at 254). Petitioner's counsel did not learn the identity of petitioner's main alibi witness until the day the witness was going to be called (*Id.*). Petitioner's counsel then attempted to put forth an alibi defense on petitioner's behalf (*Id.* at 253–60). The trial judge ruled that the late filing of the alibi notice, which occurred after petitioner took the stand, "would distort the intent of [the alibi notice requirements]," and precluded petitioner from presenting an alibi defense (*Id.* at 259). *See supra* Part II.

A review of the record indicates that counsels' conduct was reasonable. While the record does not show whether petitioner's first attorney had reason to believe petitioner had alibi witnesses, petitioner was unable to recall where he was on the day of the robbery. Upon learning of possible alibi witnesses, petitioner's trial counsel made every effort to put forth an alibi defense.

Accordingly, petitioner's ineffective assistance of counsel claim fails on this ground.

**V. Conflict of Interest.**

 Petitioner also alleges that the trial court erred by allowing petitioner's first attorney, E. Carl Cantwell, to represent him at a *Wade* hearing even though Mr. Cantwell had represented petitioner's co-conspirator in an unrelated criminal proceeding. "In order to demonstrate a violation of his Sixth Amendment rights, [petitioner] must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 728, 139 L.Ed.2d 666 (1998); *United States v. Stantini,* 85 F.3d 9, 15–16 (2d Cir.1996). Petitioner fails to meet this burden.

Prior to the start of the *Wade* hearing, the trial court presented Mr. Cantwell with a letter from Norman Charnock, requesting that Cantwell not be allowed to cross-examine him (Wade I, at 2). Apparently, Cantwell had previously represented Charnock on criminal charges in federal court (*Id.*). Cantwell discussed the matter with petitioner, and came to his own conclusion that the only time his prior representation would create a conflict would be when cross-examining Charnock (*Id.* at 3). It was Cantwell's understanding that Charnock was not going to be a witness at the *Wade* hearing, and therefore no conflict had immediately emerged (*Id.*).

The trial court asked petitioner if he agreed with Mr. Cantwell that no conflict existed at the time of the *Wade* hearing (*Id.* at 3–4). Petitioner answered, "yes" (*Id.* at 4). The prosecutor indicated that she had no concerns about the alleged conflict (*Id.*). The trial judge also believed that the hearing would not be affected by the alleged conflict, and determined that the hearing should proceed (*Id.*).

A review of the record indicates that Mr. Cantwell's representation of Charnock in a prior unrelated court appearance did not adversely affect his representation of petitioner. Charnock did not testify at the *Wade* hearing. At the hearing, Mr. Cantwell cross-examined witnesses, made objections on behalf of petitioner and moved exhibits into evidence (*See id.* at 10, 34; Tr. of Aug. 31, 1993 ("Wade II"), at 7, 9–10). Mr. Cantwell also requested that he be provided with the raw notes Deputy Kenyon took during his conversation with the Taylors (Wade II, at 32). The court granted Cantwell's request and ordered that petitioner be provided with the raw notes (*Id.* at 33)

Mr. Cantwell was permitted to withdrew as petitioner's counsel because of the potential conflict of interest (Tr. at 4–5). Mr. David Jay was then appointed to represent petitioner (*Id.* at 5).

Petitioner has failed to demonstrate that any actual conflict of interest adversely affected his attorney's performance. I find that no actual conflict of interest existed during the *Wade* hearing. Mr. Cantwell was never required to confront Charnock on petitioner's behalf because Charnock never testified at the hearing. When petitioner confronted Charnock at trial, he was represented by a different attorney.

Accordingly, a petition for a writ of habeas corpus will not issue on this ground.

## CONCLUSION

Based on the foregoing, the petition for a writ of habeas corpus (**Item 3**) is dismissed. The Clerk of the Court is directed to enter judgment in favor of respondent.

Pursuant to 28 U.S.C. § 1915(a)(3), the court certifies that an appeal from this decision and order may not be taken *in forma pauperis* because such an appeal would be frivolous and cannot be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917,

8 L.Ed.2d 21 (1962). The court also finds that the petition presents no question of substance for appellate review, and that petitioner has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Fed. R.App.P. 22(b). Accordingly, a certificate of appealability will not issue.

**SO ORDERED.**